COUNTY ROAD ASSOCIATION OF MICHIGAN v BOARD OF
STATE CANVASSERS

MICHIGAN ROAD BUILDERS' ASSOCIATION, INC v BOARD OF
STATE CANVASSERS

Docket Nos. 63038-63041. Argued July 17, 1979 (Calendar No. 1).—
Decided September 14, 1979.

People Against Higher Taxes filed petitions with the Secretary of
State seeking a referendum on 1978 PA 426, which increased
the tax on gasoline from 9 to 11 cents per gallon and the tax on
diesel motor fuel from 7 to 9 cents per gallon, and a referen-
dum on 1978 PA 427, which increased the tax on motor vehicle
registration (license-plate fees). Plaintiffs County Road Associa-
tion of Michigan, Michigan Municipal League, Southeastern
Michigan Transportation Authority, and the City of Grand
Rapids brought a complaint for mandamus in the Court of
Appeals against the Board of State Canvassers seeking to
prevent the certification of the sufficiency of the referendum
petitions, and People Against Higher Taxes intervened as a
defendant. The Michigan Road Builders' Association and others
brought a similar action which was consolidated with the
*County Road Association* case. The Court of Appeals, Bashara
and D. E. Holbrook, Jr., JJ. (M. F. Cavanagh, P.J., concurring in
part), granted mandamus preventing a referendum of the fuel
tax legislation but denied relief as to the license-plate fee
legislation, holding 1978 PA 427 to be subject to referendum
(Docket Nos. 43001, 43126). The parties appeal. *Held:*

1. The Constitution reserves to the people the power of

REFERENCES FOR POINTS IN HEADNOTES

[1, 5-8] 42 Am Jur 2d, Initiative and Referendum § 15.
68 Am Jur 2d, Sales and Use Taxes § 40.
71 Am Jur 2d, State and Local Taxation §§ 617, 618, 626.
73 Am Jur 2d, Statutes §§ 186–192.
Construction and application of constitutional or statutory provi-
sions expressly excepting certain laws from referendum. 100
ALR2d 314.
[2] 16 Am Jur 2d, Constitutional Law §§ 257, 258.
73 Am Jur 2d, Statutes §§ 186–192.
[3] 73 Am Jur 2d, Statutes §§ 186–193.
[4] 42 Am Jur 2d, Initiative and Referendum § 3.

referendum, *i.e.*, to approve or reject laws enacted by the Legislature, but the power does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds. The gasoline tax was initially enacted in 1925 in a single statute which also established the method for distributing the revenue collected. The Court held then that the highway department was a state institution within the meaning of the Constitution of 1908, and that therefore the act, as an appropriation for the use of a state institution, was not subject to referendum under the terms of the Constitution. When the Legislature used a series of acts in 1951 and 1972 to increase the taxes and distribute the revenue collected, the Court held that the acts constituted a comprehensive statutory system for the collection of specific taxes, and for the allocation of the funds and their use for highway purposes. The Court construed the acts as statutes *in pari materia* and held that they were thus not subject to referendum.

2. Like the 1951 and 1972 legislation, the 1978 acts must be viewed as a comprehensive, single legislative program. Both the Governor's statement on the proposed legislation and the available legislative history suggest that the statutes must be read *in pari materia* and thus, under the rule previously established, 1978 PA 426 and 1978 PA 427 are not subject to referendum.

3. The intervening defendants attribute too much significance to the Legislature's failure to provide a "tie-bar" in the acts so that one would not take effect until the other is enacted. Legislation need not be "tie-barred" or even specifically refer to other legislation to be read *in pari materia.* Statutes *in pari materia* are those which relate to the same person or thing, or the same class of persons or things, or which have a common purpose. It is the rule that in construction of a particular statute, all statutes relating to the same subject or having the same general purpose should be read in connection with it as together constituting one law, although enacted at different times, and containing no reference one to the other.

4. The Attorney General argues that both public acts are subject to referendum because the only appropriation was made in 1978 PA 468, the appropriation for the Department of State Highways and Transportation (now Department of Transportation). This argument seems to ignore the Court's previous decisions. In addition, the constitutional and statutory provisions concerning fuel taxes and license-plate fees are self-executing and make transportation tax legislation unique. For example, the statutory duties of the State Treasurer regarding disbursement of the Michigan Transportation Fund (formerly

the Motor Vehicle Highway Fund) would have to be executed regardless of what the appropriation act for the Department of Transportation had provided.

5. The Constitution seeks to avoid the passage of appropriation bills for items not in the budget before general appropriation bills for items in the budget are approved. However, the provision of the Constitution governing the enactment of appropriation bills is inapplicable because 1978 PA 426, 1978 PA 427, and 1978 PA 444 were part of the general appropriation bills as defined by the Constitution, and the bills were part of the Governor's budget.

6. The Attorney General also argues that the portion of this legislation crediting the money collected under the diesel motor fuel tax to the Michigan Transportation Fund must be read only as an intention to appropriate in future years to avoid a violation of the constitutional provision governing the enactment of appropriation bills. The Constitution of 1963 included new measures which were designed to require an annual review of the budget and to provide for annual fiscal accountability in both the legislative and executive branches. It prohibits the Legislature from appropriating from the general fund in advance of its ability to accurately forecast available revenues because it would thereby be unable to match revenue with appropriations as required by the Constitution. Such prospective appropriations would force also the Governor to approve or veto the expenditure far in advance of his ability to assess the fiscal needs of the state. In this case, however, there is no question of fiscal "forecasting" with the special Michigan Transportation Fund; no more is expended than is actually received.

7. The construction placed by the Court on this exception to the right of referendum in the previous cases may, indeed, in many instances deny the people a right to vote on new or increased taxes. If the question were one not previously considered, a different result might obtain. However, the identical question involving substantially the same language had been considered by this Court and settled. The delegates to the 1961 Constitutional Convention are presumed to have known and to have understood the meaning ascribed in those earlier decisions to the language of the 1908 Constitution, and the language was retained by them in the 1963 Constitution without modification in response to the earlier decisions. Under well-established principles, it is not open to the Court to place a new construction on this language. There is nothing in the arguments of the parties, the legislative history of the 1978 enactments, or

statutory or constitutional material cited by the parties to cause a conclusion as to this transportation package different from that reached by the Court in 1974 and 1952. The acts in question are not subject to referendum.

The judgment of the Court of Appeals is affirmed as to 1978 PA 426 and reversed as to 1978 PA 427.

89 Mich App 299; 279 NW2d 334 (1979) affirmed in part, reversed in part.

1. CONSTITUTIONAL LAW — REFERENDUM — GASOLINE TAX — DIESEL FUEL TAX — LICENSE-PLATE FEES — MICHIGAN TRANSPORTATION FUND.

The 1978 legislation which increased the taxes on gasoline and diesel motor fuel and the tax on motor vehicle registration must be viewed as a comprehensive single legislative program to collect specific taxes and to allocate the funds for transportation purposes; the statutes must be read *in pari materia* as an appropriation for the use of a state institution, the Department of Transportation, and therefore they are, under the rule previously established by the Court, not subject to referendum (Const 1963, art 2, § 9; 1978 PA 426; 1978 PA 427).

2. STATUTES — CONSTRUCTION — *IN PARI MATERIA* — WORDS AND PHRASES.

Legislation need not be "tie-barred" to provide that one act would not take effect until the other is enacted or even specifically refer to the other legislation to be read *in pari materia.*

3. STATUTES — CONSTRUCTION — *IN PARI MATERIA* — WORDS AND PHRASES.

Statutes *in pari materia* are those which relate to the same person or thing, or the same class of persons or things, or which have a common purpose; in the construction of a statute, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although enacted at different times, and containing no reference to each other.

4. TAXATION — GASOLINE TAX — DIESEL FUEL TAX — LICENSE-PLATE FEES — MICHIGAN TRANSPORTATION FUND.

The constitutional and statutory provisions concerning the allocation of the gasoline tax, the diesel motor fuel tax and the motor vehicle registration tax to the Michigan Transportation Fund are self-executing and make transportation tax legislation unique; for example, the statutory duties of the State Treasurer regarding disbursement of the Michigan Transportation Fund

would have to be executed regardless of what the appropriation act for the Department of Transportation had provided (Const 1963, art 9, § 9; MCL 247.660, 247.667; MSA 9.1097[10], 9.1097[17]).

5. Constitutional Law — Statutes — Appropriations — Gasoline Tax — Diesel Fuel Tax — License-Plate Fees.

The Constitution seeks to avoid the passage of appropriation bills for items not in the budget before general appropriation bills for items in the budget are approved; however, that constitutional provision is inapplicable to the 1978 legislation which increased the taxes on gasoline and diesel motor fuel and the tax on motor vehicle registration because that legislation was part of the general appropriation bills as defined by the Constitution and the bills were part of the Governor's budget (Const 1963, art 4, § 31; 1978 PA 426; 1978 PA 427; 1978 PA 444).

6. Constitutional Law — Appropriations — Statutes.

The Constitution of 1963 included new measures which were designed to require an annual review of the budget and to provide for annual fiscal accountability in both the legislative and executive branches; it prohibits the Legislature from appropriating from the general fund in advance of its ability to accurately forecast available revenues because it would thereby be unable to match revenues with appropriations as required by the Constitution, and it would force the Governor to approve or veto the expenditure far in advance of his ability to assess the fiscal needs of the state (Const 1963, art 4, § 31; Const 1963, art 5, §§ 18, 19).

7. Constitutional Law — Appropriations — Gasoline Tax — Diesel Fuel Tax — Michigan Transportation Fund.

The 1978 legislation which allocates motor vehicle fuel taxes to the credit of the Michigan Transportation Fund need not be read as only an intention to appropriate in future years to avoid a violation of the constitutional provision governing the enactment of appropriation bills because there is no question of fiscal "forecasting" with the special Michigan Transportation Fund; no more is expended than is actually received (Const 1963, art 4, § 31; MCL 207.134; MSA 7.316[14]).

8. Constitutional Law — Referendum — Judicial Construction — Constitutional Convention.

The delegates to the 1961 Constitutional Convention are presumed to have known and to have understood the meaning ascribed by the Supreme Court to the language of the 1908

Constitution on the power of referendum; the language on referendum was retained by them in the 1963 Constitution without modification in response to the earlier decisions, and under well-established principles, it is not open to the Court to place a new construction on the language (Const 1908, art 5, § 1; Const 1963, art 2, § 9).

*Downs, Pirich & Downs, P.C.,* for plaintiffs County Road Association of Michigan, Michigan Municipal League, Southeastern Michigan Transportation Authority, and the City of Grand Rapids.

*Butzel, Long, Gust, Klein & Van Zile* (by *William A. Saxton, John B. Weaver,* and *James E. Stewart)* for plaintiffs Michigan Road Builders' Association, Michigan Office of Services to the Aging, Capitol Area Rail Council, Michigan Association of Railroad Passengers, and Michigan State Legislative Board, United Transportation Union.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Varda N. Fink,* Assistant Attorney General, for defendant.

*Sinas, Dramis, Brake, Boughton, McIntyre & Reisig, P.C.,* for intervening defendants People Against Higher Taxes.

PER CURIAM. The question before us is whether 1978 PA 426, increasing the gasoline tax from 9 to 11 cents per gallon and the diesel motor fuel tax from 7 to 9 cents, and 1978 PA 427, increasing the motor vehicle registration tax, among other things, are subject to referendum. We hold that they are not.

I

On February 10, 1977, the Governor delivered a

special message to the Legislature inviting their attention to the whole transportation framework in Michigan:

"These changes—to a comprehensive, unified approach to transportation funding and planning and policy development—must be made. Among the factors that have led me to this conclusion are the following:

"—Present revenues for financing transportation have stabilized or declined compared to other sources of revenues.

"—According to the U.S. Department of Commerce, local-state expenditures for transportation services and highways, roads and streets are lower proportionately in Michigan than in other comparable states in the Midwest and Northeast.

"—Rising inflation has been particularly detrimental to transportation capital outlay programs and highway and airport construction needs, as well as maintenance costs and operating expenses.

"—The motor vehicle weight tax, a major source of transportation financing, is not well correlated with ability to pay.

"—At present, there is a fragmented intergovernmental approach toward transportation planning at the local level.

"—Existing constitutional or legislative restrictions blur accountability in the administration of state transportation programs.

*"The estimated new revenue produced by proposals in this message amounts to at least $144.8 million during each of the next five fiscal years.* If enacted by May of this year, an additional $47.1 million would be generated in this fiscal year to support transportation programs in Michigan.

"The transportation plan would:

"—increase funds for city and village streets by $23.4 million annually, to a total of $132.9 million—an increase of 21 percent over the current annual amount;

"—increase funds for county roads by $42.4 million each year to a total of $239.9 million—an increase of 23 percent;

"—add $48 million per year for programs adminis-
tered by the Department of State Highways and Trans-
portation, bringing the annual total to $320 million—an
increase of 17.6 percent;

"—pay the entire $31 million cost of State Police
patrolling of all 9,400 miles of state freeways and
highways.

*"Tax Recommendations*

"In connection with these goals, I am recommending
an increase in motor fuel taxes and revisions in the
vehicle weight tax.

*"I am recommending an increase in the gasoline and
diesel fuel taxes to 11 cents per gallon. In addition, I
am recommending the imposition of the diesel fuel tax
on diesel fuel used by railroad locomotives."*

Representatives Ryan and Brotherton intro-
duced House Bill 4407 on March 23, 1977, increas-
ing the tax on gasoline and diesel motor fuel. That
same day Representative Montgomery introduced
House Bill 4408, providing for an increase in the
vehicle weight tax different from that proposed by
the Governor. Both were referred to the House
Taxation Committee. 1 Michigan House Journal
(1977) 605. Other bills to implement the Gover-
nor's proposals were introduced as well. The
House Legislative Analysis of HB 4408 is instruc-
tive of the "package" nature of these bills:

"The bill is part of a package of proposed legislation
its supporters say would provide the state with a com-
prehensive transportation program. House Bill 5656
would change the name of the Motor Vehicle Highway
Fund to the Michigan Transportation Fund and would
establish a State Department of Transportation Fund
which would receive money from the gas/diesel fuel tax
and the vehicle weight tax, a portion of which would go
to support a comprehensive transportation fund (metro-
politan bus systems, rail passenger and freight systems,
intercity programs, dial-a-ride, small bus systems, and

airport improvement programs). House Bill 4407 would increase the tax on gasoline to 11 cents a gallon (it is now 9) and on diesel fuel to 9 cents a gallon (it is now 7), the revenue going to the Transportation Fund. House Bill 5654 would specify that part of the sales tax on auto dealers, parts dealers, and service stations would go to the comprehensive transportation fund. House Bill 4409 would change the name of the Department of State Highways and Transportation to the Transportation Department, and redefine the responsibilities, powers, and duties of the department director and the Highway Commission. House Bill 4410 would amend the Executive Organization Act to change the name of the department, establish job qualifications for the director (at least 5 years of experience in highway or transportation engineering, or possession of an engineering degree), and bring both the Department of Aeronautics and the Aeronautics Commission into the Department of Transportation. House Joint Resolution F would change the name of the Highway Commission to the Transportation Commission, expand the commission to 6 members (from 4), reduce terms from 4 years to 3, specify that the Director of the Department of Transportation be appointed by the governor, and delete the requirement that the director be a highway engineer. House Bill 6080 would transfer aviation tax revenues in the aeronautics fund to the comprehensive transportation fund. House Bill 6081 would specify that marine gasoline tax revenues continue to go to the Waterways Fund at the present amount (1.25% of all fuel taxes other than the diesel tax collected in 1977), but that anything above that amount go to the comprehensive transportation fund."

Speaker Crim's opening day remarks on January 11, 1978, were in a vein similar to the Governor's:

"The need is obvious. A balanced transportation system—good roads, streets and highways combined with sound bus, rail, air and water programs demands immediate passage of the transportation package. Without

adoption of the package, much of this will be lost. Therefore I am calling on the Governor and my fellow legislative leaders not only to recognize this acute need, but also to join with me in a vigorous campaign to effect immediate passage of the transportation package. It is our responsibility to demonstrate to the people of this state the absolute necessity of this package, including the tax increase required for financing."

Among the results were:

1) 1978 PA 426, increasing fuel taxes, on which legislative action was completed on September 28 and the Governor's signature obtained September 30;

2) 1978 PA 427, increasing the motor vehicle weight tax, on which legislative action was completed on September 27 and the Governor's signature obtained September 30; and

3) 1978 PA 444, providing among other things for the allocation of Michigan transportation funds, on which legislative action was completed on September 28 and the Governor's signature obtained October 10.

The acts contain no "tie-bar" language.

## II

Const 1963, art 2, § 9 provides in part:

"The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law

was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required."

On January 2, 1979, the People Against Higher Taxes filed with the Secretary of State petitions seeking referendum of 1978 PA 426. On January 9, 1979, the group similarly filed petitions seeking referendum of 1978 PA 427. On January 3, 1979, the County Road Association filed a complaint for mandamus in the Court of Appeals; Michigan Road Builders' Association, Inc., filed a similar complaint on January 12, 1979. The plaintiffs sought an order preventing the Board of State Canvassers from certifying the sufficiency of the petitions. On January 12, 1979, the Court of Appeals entered an order setting the cases for oral argument and directed

"that defendant Board of State Canvassers desist from making any official declaration of sufficiency or insufficiency of the petitions for referendum on 1978 PA 426 and 1978 PA 427 until further order of this Court. In the meantime, the Elections Division of the Department of State may proceed with the canvass of the petitions in the ordinary course, but shall not present its staff recommendation to the Board of State Canvassers while this stay is in effect."

On March 30, 1979, the Court of Appeals entered the requested order of mandamus as to 1978 PA 426, but not as to 1978 PA 427, finding the latter to be subject to referendum. 89 Mich App 299; 279 NW2d 334 (1979). Judge CAVANAGH dissented as to 1978 PA 427. Because timely applications for leave to appeal were filed in this Court,

the Court of Appeals stay of January 12, 1979, remained in effect.[1] 406 Mich 1119 (1979).

### III

The gasoline tax was initially enacted in a single statute which also established the method for distributing the revenue collected. 1925 PA 2. This Court was quickly asked in a mandamus action whether the statute was subject to referendum under Const 1908, art 5, § 1.[2] We said:

"Considering these constitutional exceptions in the order stated, the first question to be determined is whether this is an act making appropriations for a State institution. It appropriates money for the use of the highway department in constructing and maintaining the highways of the State. Is the highway department a State institution within the meaning of the Constitution? The question is not solely whether the highway department may be correctly termed a State institution, but rather whether, in view of the functions which it exercises, it comes within the meaning of that term as used in the Constitution. It is not difficult to determine what the framers of the Constitution had in mind. It is clear that by permitting immediate effect to be given to appropriation acts for State institutions, it was their purpose to enable the State to exercise its various functions free from financial embarrassment. The highway department exercises State functions. It was created by the legislature for that purpose. It must have money to carry on its activities. Without the money appropriated by this act for its immediate use, it would cease to function. The constitutional purpose was

---

[1] See *People v George,* 399 Mich 638; 250 NW2d 491 (1977).

[2] "The legislative power of the state of Michigan is vested in a senate and house of representatives; but the people reserve to themselves the power to propose legislative measures, resolutions and laws; to enact or reject the same at the polls independently of the legislature; and to approve or reject at the polls any act passed by the legislature, except acts making appropriations for state institutions and to meet deficiencies in state funds."

to prevent such a contingency. And so we hold it a fair conclusion that the framers of the Constitution used the term State institutions in a broad sense intending to include all organized departments of the State to which the legislature had delegated or should delegate the exercise of State functions.

\* \* \*

"We are of the opinion that the State highway department is a State institution within the meaning of the Constitution, and that, therefore, this act, which makes an appropriation for its use, is not subject to the referendum." *Detroit Automobile Club v Secretary of State,* 230 Mich 623, 625-626; 203 NW 529 (1925).

We reaffirmed that the legislation was not subject to referendum after the Legislature enacted a new gasoline tax in 1927 PA 150. *Moreton v Secretary of State,* 240 Mich 584, 591-592; 216 NW 450 (1927).

In 1951, the Legislature used five acts to accomplish its purpose of increasing the fuel and weight taxes and distributing the revenue collected. 1951 PA 51 was the predecessor of 1978 PA 444 in establishing the Motor Vehicle Highway Fund, providing for the deposit in the fund of specific tax revenue, and allocating the money deposited. 1951 PA 54 amended 1925 PA 2 to increase the fuel taxes; under § 18b,

"All sums of money received and collected under the provisions of this act, except the license fees provided for herein, shall be deposited in the state treasury to the credit of the motor vehicle highway fund and, after the payment of the necessary expenses incurred in the enforcement of this act, are hereby appropriated, allocated and apportioned therefrom to the state highway department, the several county road commissions, and incorporated cities and villages of the state in the manner and for the specific highway purposes prescribed by law."

In a mandamus action, we were asked to decide whether 1951 PA 54 was subject to referendum. The argument made was that 1951 PA 51 actually made the appropriation and therefore 1951 PA 54 was not an appropriation act and was subject to referendum.

We said:

"*Acts 51 to 55,* inclusive, PA 1951, to which plaintiffs thus point, *constitute a comprehensive system for the collecting of specific taxes on motor vehicles and motor vehicle fuels, the allocation of funds therefrom and the use thereof for highway purposes. They were all enacted by the 1951 legislature and became effective at the same time.* Construed together, they provide for levying the specific taxes and the use thereof for highway purposes, the manner in which the said appropriations for highway purposes are allocated to said institutions, and the specific highway purposes for which they are to be used by said institutions. Act 51 allocates said funds, after payment of necessary expenses, as follows: 44% to the State highway department, 37% to the several county road commissions, and 19% to incorporated cities and villages which contain State trunk line highways; and declares that all of it shall be used only for highway purposes.

"Acts *in pari materia* must be considered and construed together. Act 54, levying the specific tax and appropriating it to these institutions 'for the specific highway purposes prescribed by law,' necessarily points directly to those other acts for the apportioning of said moneys and for directing the manner of its use. If considered separately, without construing them together, they would be unworkable. Furthermore, if Act 51, instead of Act 54, appropriates these moneys, then Act 51 as well as Act 54 would fall; because Act 51 expressly provides (section 23) that it shall not take effect unless Act 54 also be enacted into law and become effective. Act 51 could not operate without Act 54, being without the funds appropriated by said Act 54." (Emphasis added.) *Michigan Good Roads Federa-*

*tion v State Board of Canvassers,* 333 Mich 352, 360-361; 53 NW2d 481 (1952).

In 1972, the Legislature again increased the gasoline tax. 1972 PA 326 and 1972 PA 327. An amended § 18b was included. The acts were "tie-barred" and enacted the same day. In *Boards of County Road Commissioners v Board of State Canvassers,* 391 Mich 666, 674; 218 NW2d 144 (1974), we were again asked to consider whether the tax increase was subject to referendum and held it was not:

"The acts were enacted on the same day as part of a single legislative program. Each act included a so-called tie-bar provision that it 'shall not take effect' until the other act is 'enacted into law.'

"While Act 327 (apportioning and appropriating the monies in the highway fund) would be viable even if Act 326 (raising the gasoline tax) were subjected to a referendum and defeated, as the motor vehicle highway fund would still be receiving and apportioning the net revenue from the former seven cents a gallon tax, it is apparent that the Legislature predicated the new appropriations for mass transit and the critical bridge program on a nine cents gasoline tax.

"If these new appropriations were effective independently of the validity of the nine cents gasoline tax, a defeat of PA 326 would mean that the state highway department and county road commissioners would receive less money than before from the highway fund to finance previously authorized and contemplated programs. We are persuaded that was not the intention of the Legislature."

## IV

1978 PA 426 included amendments to both § 18b and § 34:

"Sec. 18b. All sums of money received and collected under this act, except the license fees provided for in this act and after the payment of the necessary expenses incurred in the enforcement of this act, shall be deposited in the state treasury to the credit of the Michigan transportation fund." MCL 207.118b; MSA 7.308(2).

"Sec. 34. All sums of money received and collected by the secretary of state under this chapter [chapter 2, the diesel motor fuel tax], except the license fees herein provided, shall be deposited in the state treasury to the credit of the Michigan transportation fund, and after the payment of the necessary expenses incurred in the enforcement of this chapter shall be appropriated, allocated and apportioned therefrom to the department of transportation, the several county road commissions and incorporated cities and villages of the state in the manner and for the specific highway purposes prescribed by law." MCL 207.134; MSA 7.316(14).

1978 PA 427 did not amend § 810 of the statute,[3] although it did amend 1949 PA 300 which included that section and also amended § 802 which provides for the deposit of certain fees and taxes in the state general fund or the Motor Vehicle Highway Fund and earmarks the use of those revenues.[4]

---

[3] "All fees received and money collected under sections 801 to 809, inclusive, shall be deposited in the state treasury and shall be credited to the motor vehicle highway fund." MCL 257.810; MSA 9.2510.

[4] "(a) For special plates or stickers issued as provided for in section 226(c), there shall be paid 1/2 the tax imposed under section 801 and in addition a fee of $2.00. The fee shall be credited to the general fund and used to defray the expenses of the special plates or stickers.

"(b) For all commercial vehicles registered after August 31 for the period expiring the last day of February or other vehicles registered after September 30 for the period expiring March 31, a tax of 1/2 the rate otherwise imposed by this act shall be collected. This section is not applicable to vehicles registered by manufacturers or dealers under sections 244 to 247.

"(c) For each special registration as provided for in section 226(e), a fee of $5.00 shall be collected. The fee shall be credited to the general fund and used to defray the expenses of the special registrations.

"(d) For temporary registration plates or markers as provided for in

1978 PA 444 clearly brought the 1978 PA 426 and 1978 PA 427 revenues within the newly-named Michigan Transportation Fund:

"Sec. 10. A fund to be known as the Michigan transportation fund is established and shall be set up and maintained in the state treasury as a separate fund. Money received and collected under Act No. 150 of the Public Acts of 1927, as amended, being sections 207.101 to 207.194 of the Michigan Compiled Laws, except a license fee provided in that act, and a tax, fee, license, and other money received and collected under sections 801 to 810 of Act No. 300 of the Public Acts of 1949, as amended, being sections 257.801 to 257.810 of the Michigan Compiled Laws, and money received under Act No. 254 of the Public Acts of 1933, as amended, being sections 475.1 to 479.49 of the Michigan Compiled Laws, shall be deposited in the state treasury to the credit of

section 226a, a fee of $5.00 for each group of 5 of those temporary registration plates or markers shall be collected. The fee shall be credited to the motor vehicle highway fund and used to defray the expenses of the temporary registration plates or markers.

"(e) For each special registration as provided for in section 226b, a fee of $2.00 shall be collected, the fee to be credited to the motor vehicle highway fund and used to defray the expenses of the special registrations.

"(f) For registration plates as provided for in section 226a(c), (f), and (g), a fee of $40.00 for 2 sets and $20.00 for each additional set of plates shall be collected. The fee shall be credited to the motor vehicle highway fund and used to defray the expenses of the temporary plates or markers.

"(g) For special registrations issued for special mobile equipment as provided in section 216(d), a fee of $15.00 each for the first 3 special registrations, and $5.00 for each special registration issued in excess of the first 3 shall be collected. The fee shall be credited to the motor vehicle highway fund and used to defray the expenses of the plates or markers.

"(h) Beginning February 1, May 1, August 1, and November 1 of each year the secretary of state upon request, shall issue special license plates, tabs, or stickers for vehicles used in the logging industry to expire May 14, August 14, November 14, and February 14 following, if the full registration fee exceeds $50.00, on the payment of 1/4 the full registration fee and in addition a service charge of $2.00. The service charge shall be credited to the general fund of the state and used to defray the expense of the license plates, tabs, or stickers." MCL 257.802; MSA 9.2502.

the Michigan transportation fund. In addition, income or profit derived from the investment of money in the Michigan transportation fund shall be deposited in the Michigan transportation fund. No other money, whether appropriated from the general fund of this state or any other source, shall be deposited in the Michigan transportation fund. After the payment of the amounts appropriated by the legislature for the necessary expenses incurred in the administration and enforcement of Act No. 150 of the Public Acts of 1927, as amended, Act No. 254 of the Public Acts of 1933, as amended, and sections 801 to 810 of Act No. 300 of the Public Acts of 1949, as amended, and after deduction of the amount appropriated pursuant to section 93 of Act No. 150 of the Public Acts of 1927, being section 207.193 of the Michigan Compiled Laws, and the amounts appropriated pursuant to section 11b, all money in the Michigan transportation fund is apportioned and appropriated for each fiscal year as follows: (a) 46.7% of the fund to the department of transportation for the uses described in sections 10b and 11, (b) 34.3% of the fund to the county road commissions of the state, and (c) 19.0% of the fund to the cities and villages of the state. The money appropriated pursuant to this section shall be used for the purposes as provided in this act and any other applicable act."

## V

Like the 1951 and 1972 legislation, we believe the 1978 acts must be viewed as a comprehensive, single legislative program. Both the Governor's stated approach and what legislative history[5] is available suggest, in the language of the 1952 Court, "a comprehensive system for the collecting of specific taxes on motor vehicles and motor vehicle fuels, the allocation of funds therefrom and the use thereof for [transportation] purposes".

[5] See, *e.g.,* the comments of Senators DeMaso and Welborn during Senate debate on the bills. Michigan Senate Journal (No. 105, 1978) 2131.

Intervening defendants attribute too much significance to the Legislature's failure to "tie-bar" the acts. Legislation need not be tie-barred or even specifically refer to other legislation to be read *in pari materia:*

"Statutes *in pari materia* are those which relate to the same person or thing, or the same class of persons or things, or which have a common purpose. It is the rule that in construction of a particular statute, or in the interpretation of its provisions all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although enacted at different times, and containing no reference one to the other." *Detroit v Michigan Bell Telephone Co,* 374 Mich 543, 558; 132 NW2d 660 (1965).

Section 10 of 1978 PA 444, §§ 18b and 34 of 1978 PA 426, and § 802 of 1978 PA 427, reviewed in light of what we said in 1974 and 1952, lead us inescapably to the conclusion that these statutes must be read *in pari materia* and thus, under the rule we have previously established, 1978 PA 426 and 1978 PA 427 are not subject to referendum.

The Attorney General argues that both public acts are subject to referendum. He says that the only appropriation act was 1978 PA 468, the appropriation act for the Department of State Highways and Transportation. This argument seems to ignore our 1974 and 1952 decisions. In addition, Const 1963, art 9, § 9,[6] and 1951 PA 51, as amended, are self-executing and make transportation tax legislation unique. MCL 247.667; MSA

[6] "All specific taxes, except general sales and use taxes and regulatory fees, imposed directly or indirectly on fuels sold or used to propel motor vehicles upon highways and on registered motor vehicles shall, after the payment of necessary collection expenses, be used exclusively for highway purposes as defined by law."

9.1097(17), for example, clearly explains what the State Treasurer's duties are regarding disbursement of the fund; these duties would have to be executed regardless of what the appropriation act for the Department of State Highways and Transportation had provided.

He also argues that 1978 PA 426 cannot be held to be an appropriation act without violating Const 1963, art 4, § 31.[7] We agree with the Court of Appeals resolution of that argument:

"That section is inapplicable because 1978 PA 426, 427 and 444 were part of general appropriation bills as defined by Const 1963, art 4, § 31, and those bills were part of the Governor's budget. Article 4, § 31 seeks to avoid the passage of appropriation bills for items *not in the budget* before general appropriation bills for items in the budget are approved." 89 Mich App 306.

Relying on *Board of Education of Oakland Schools v Superintendent of Public Instruction,* 392 Mich 613; 221 NW2d 345 (1974), and *Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10),* 396 Mich 465; 242 NW2d 3 (1976), the Attorney General also argues that § 34 must be read only as an intention to appropriate in future years or we would also face a violation of Const 1963, art 4, § 31. Both of those opinions

---

[7] "The general appropriation bills for the succeeding fiscal period covering items set forth in the budget shall be passed or rejected in either house of the legislature before that house passes any appropriation bill for items not in the budget except bills supplementing appropriations for the current fiscal year's operation. Any bill requiring an appropriation to carry out its purpose shall be considered an appropriation bill. One of the general appropriation bills as passed by the legislature shall contain an itemized statement of estimated revenue by major source in each operating fund for the ensuing fiscal period, the total of which shall not be less than the total of all appropriations made from each fund in the general appropriation bills as passed."

involved expenditures from the general fund, not special funds:

"The Michigan Constitution of 1963 brought to this state new measures designed to require an annual review of the budget and to provide for annual fiscal accountability in both the legislative and executive branches. See, Const 1963, art 4, § 31 and art 5, § 18 and the 'Convention Comment' accompanying each section. * * * The Legislature would be, in effect, appropriating in advance of its ability to accurately forecast available revenues and would thereby be unable to match revenue with appropriations as required by Const 1963, art 4, § 31. In addition, such prospective appropriations would force the Governor to approve or veto the expenditure far in advance of his ability to assess the fiscal needs of the state. See generally, Const 1963, art 5, §§ 18 and 19." 392 Mich 621.

There is no question of "forecasting" with this special fund; no more is expended than is actually received.

Finally, the Attorney General contends that a decision that the acts are not subject to referendum will frustrate the people's reserved right of referendum. We believe we answered that argument in 1974:

"The construction placed by this Court on this exception to the right of referendum in the 1925 *Detroit Automobile Club,* 1927 *Moreton* and 1952 *Good Roads* cases may, indeed, in many instances deny the people a right to vote on new or increased taxes. If the question were one not previously considered, a different result might obtain. However, the identical question involving substantially the same language has been considered by this Court and settled.

"The delegates to the 1961 Constitutional Convention are presumed to have known and to have understood the meaning ascribed in these earlier decisions to the language of the 1908 Constitution. This language was

retained by them in the 1963 Constitution without modification in response to the earlier decisions. Under well-established principles, it is not open to us to place a new construction on this language." 391 Mich 676.

We are unable to find anything in the arguments of the parties, the legislative history of the 1978 enactments, or statutory or constitutional material cited to cause us to come to a conclusion as to this transportation package different from that reached in 1974 and 1952. The acts in question are not subject to referendum. The Court of Appeals is reversed in part and affirmed in part. That Court shall issue the requested order of mandamus as to the petitions for referendum of both 1978 PA 426 and 1978 PA 427.

No costs.

COLEMAN, C.J., and KAVANAGH, WILLIAMS, LEVIN, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred.